**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

DAVID FILLMORE                                                        PLAINTIFF

v.                                    **Case No. 4:16-cv-00300 KGB**

CULPEPPER & ASSOCIATES
SECURITY SERVICE, INC.                                               DEFENDANT

**OPINION AND ORDER**

Plaintiff David Fillmore brings this action under 42 U.S.C. § 1981, Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"), and the Fourteenth Amendment to the

United States Constitution, alleging race discrimination and retaliation.  Defendant Culpepper &

Associates Security Service, Inc. ("CASS") has filed a motion for summary judgment, seeking

judgment in its favor on Mr. Fillmore's claims (Dkt. No. 23).  Mr. Fillmore has responded in

opposition (Dkt. No. 29), and CASS has replied (Dkt. No. 36).  For the reasons that follow, the

Court grants CASS's motion for summary judgment.

**I.      Factual Background**

Unless otherwise noted, the following facts are taken from CASS's statement of undisputed

material facts (Dkt. No. 25), Mr. Fillmore's response to defendant's statement of undisputed

material facts (Dkt. No. 31), and Mr. Fillmore's statement of disputed facts (Dkt. No. 32).

CASS is a 100 percent minority-owned and privately held company headquartered in

Atlanta, Georgia (Dkt. No. 25, ¶¶ 1, 6).  Louis and Vera Culpepper own CASS and are African-

American (*Id*., ¶¶ 2, 3).  At all times relevant to Mr. Fillmore's claims, Louis Culpepper was the

president of CASS, Vera Culpepper served as vice president, and either Christopher Culpepper—

son of Louis and Vera Culpepper—or Larry Similton served as Director of Operations (*Id*., ¶ 26).

Christopher Culpepper and Mr. Similton are African-American (*Id*., ¶¶ 3, 27).

CASS is licensed in a majority of states and specializes in providing uniformed security officers and law enforcement personnel to federal agencies, including the William Jefferson Clinton Presidential Library in Little Rock, Arkansas ("Clinton Library") (*Id*., ¶¶ 5, 7). CASS provides armed security officers for the Clinton Library 24 hours a day, 7 days a week (*Id*., ¶ 10). As detailed in the Request for Quote ("RFQ") for the respective contract period, CASS security officers are responsible for maintaining law and order within the area of assignment and detecting and detaining any persons attempting to gain unauthorized access to the Clinton Library (Dkt. No. 25, ¶ 10). The Clinton Library is visited by the Secret Service, Former President William Jefferson Clinton, and former First Lady and Secretary of State Hillary Clinton, as well as thousands of guests (*Id*., ¶ 11). It houses precious—in many instances irreplaceable—artefacts and documents (*Id*.). All security guards hired by CASS must meet specific requirements for working at a federal facility with special security demands and unique contents (*Id*.). The National Archives and Records Administration ("NARA") awards contracts for security guard services at the Clinton Library.

CASS first obtained the federal contract to provide armed security guards for the Clinton Library in August 2009 (*Id*., ¶ 8). The 2009 contract specified the personnel CASS was to provide, including an on-site supervisor (*Id.*, ¶ 12). CASS appointed John Sanders to serve as on-site supervisor until the end of the first contract period (Dkt. No. 25, ¶¶ 13, 14). CASS contends that, during Mr. Sanders' tenure, NARA became displeased with Mr. Sanders' methods of supervision and did not feel that its policies and procedures were being followed or enforced (*Id*., ¶ 15). CASS submits that, leading into the bidding process for the new contract, NARA made clear to CASS that, if it was awarded another contract, it would have to make changes to its leadership (*Id*., ¶ 17). CASS submits that, in order to be awarded the 2014 contract, NARA mandated that CASS employ

an on-site supervisor who would enforce policies and post orders more consistently than Mr. Sanders had during the previous contract period (*Id.*, ¶¶ 16-18).  In accordance with NARA's directives, CASS made changes in its leadership structure (*Id.*, ¶ 20).  CASS was awarded a new contract with the Clinton Library in October 2014 (*Id.*, ¶ 9).

Beginning in October 2014, Keith Morris, who is Caucasian, was promoted to serve as the new on-site supervisor (Dkt. No. 25, ¶ 22).  Mr. Sanders, Jesse Stacy, Evan Hendricks, Jimmy Vance, and Christopher Abel were appointed as sergeants (*Id.*, ¶ 23).  Mr. Sanders is African American (*Id.*).  Mr. Stacy, Mr. Hendricks, Mr. Vance, and Mr. Abel are Caucasian (*Id.*).  At the start of the 2014 contract, CASS employed 34 security officers at the Clinton Library; of these officers, 14 were African-American and 20 were Caucasian (*Id.*, ¶ 21).  At the inception of the 2014 contract period, CASS held a meeting with the officers at the Clinton Library and introduced Mr. Morris as the on-site manager (*Id.*, ¶ 35).  CASS explained NARA's concerns and advised the officers that, going forward, post orders would be strictly adhered to and that CASS had instructed Mr. Morris to report violations of policies and post orders to CASS (Dkt. No. 25, ¶ 35).

Mr. Fillmore began working at the Clinton Library in approximately 2004 (*Id.*, ¶ 28).  A different security company held the library contract at that time (*Id.* ¶ 28).  Mr. Fillmore was first hired by CASS on August 1, 2009, as a security officer (*Id.*).  CASS rehired Mr. Fillmore after it was awarded the second contract in October 2014 (*Id.*).  Mr. Morris, Mr. Sanders, Mr. Stacy, Mr. Hendricks, Mr. Vance, and Mr. Abel had worked with Mr. Fillmore under the prior contract (*Id.*, ¶ 24).

CASS utilized a progressive disciplinary procedure (Dkt. Nos. 25, ¶ 32; 30, at 7).  CASS submits that all reprimands issued to employees—whether verbal, written, or otherwise—had to be approved by the corporate office and the Director of Operations before being executed by the

on-site manager (Dkt. No. 25, ¶ 25). CASS submits that the sergeants reported to the on-site supervisor, who in turn reported directly to the Director of Operations, who in turn reported to the Executive Vice President (*Id.*). CASS submits that the President of CASS oversaw any appeals (*Id.*). Mr. Fillmore contends that, despite testimony by Ms. Culpepper that the progressive disciplinary policy applied to everyone uniformly, the on-site manager—Mr. Morris—was primarily responsible for administering discipline to the security officers (Dkt. No. 31, ¶ 25).

Each officer at the Clinton Library is assigned to work different posts (Dkt. No. 25, ¶ 29). NARA provides its vendors—such as CASS—post orders that its vendors are required to follow (*Id.*). Officers are trained on post orders (*Id.*). Post orders are posted at each of the posts explaining the duties and responsibilities of the officer assigned to that post (*Id.*). In addition, post order binders are housed in the control room and contain copies of the post orders (*Id.*). Mr. Fillmore claims to have had his own copies of the post orders (*Id.*, ¶ 29; Dkt. No. 32, ¶ 4).

The parties dispute whether the post orders disallowed the use of cell phones (Dkt. Nos. 25, ¶ 29; 31, ¶ 29). The parties further dispute whether the post orders required the security officers to obtain relief before leaving a post (*Id.*).

At the time of his hiring, Mr. Fillmore received an employee handbook (Dkt. No. 25, ¶ 30). The employee handbook contained an Equal Employment Opportunity policy, a policy prohibiting harassment and discrimination, a complaint procedure, and an anti-retaliation policy (*Id.*, ¶ 31). The employee handbook also advised that employment with CASS was at-will, contained conduct standards and discipline guidelines, and explained the progressive discipline policy (*Id.*, ¶ 32). Mr. Fillmore acknowledged that he read and understood the policies and post orders (*Id.*, ¶ 34).

CASS contends that the employee handbook also informed Mr. Fillmore of CASS's policy prohibiting cell phone use while on duty (*Id.*, ¶ 33). Mr. Fillmore denies this; he contends that Mr.

Morris changed the policy on the use of cell phones because Mr. Morris preferred to communicate via email and that cell phones were permitted to be used to check email correspondence and post schedules (Dkt. Nos. 31, ¶ 33; 32, ¶ 124). Mr. Fillmore further submits that the post orders were sent in email (Dkt. No. 32, ¶ 124).

Following the appointment of Mr. Morris as on-site manager, Mr. Fillmore was disciplined three times. CASS contends that Mr. Fillmore violated policies and post orders (Dkt. No. 25, ¶ 36). Mr. Fillmore denies violating policies and post orders (Dkt. No. 31, ¶ 36).

On October 18, 2014, Mr. Fillmore received his first disciplinary from Mr. Morris for abandoning his post in violation of the post order (Dkt. No. 25, ¶ 37). Mr. Fillmore maintains that he never left his post (Dkt. No. 31, ¶ 37). Mr. Fillmore further maintains that the post orders did not require him to obtain relief before leaving the post (*Id.*, ¶ 29). Mr. Fillmore contends that the post he allegedly abandoned was a roving, non-static position. As part of his rover shift, his duties were to go from the second floor to the third floor in order to inspect the floors, the stairwell, the freight elevators, and the bathrooms (*Id.*, ¶ 37). He contends that he was required to inspect the bathroom at least every 20 minutes and that stopping to use the bathroom was part of his inspection (*Id.*). Mr. Fillmore contends that he did not think there was a need to get relief to go to the bathroom while working that position (Dkt. No. 32, ¶ 77). He alleges that Caucasian officers did not obtain relief to go to the bathroom and were not punished by Mr. Morris (Dkt. Nos. 32, ¶ 16; 31, ¶ 29). Mr. Fillmore further alleges that every hour he was required to leave his post and go to the Chihully art exhibit located on the third floor and that no one relieved him while he was away at the exhibit (Dkt. No. 31, ¶ 29).

On September 11, 2015, Mr. Morris issued Mr. Fillmore a second disciplinary for use of a media device while on post. CASS contends that on September 1, 2015, and on September 4,

2015, Mr. Fillmore was observed using a cell phone while on post in violation of the employee handbook and post orders (Dkt. No. 25, ¶ 38).  Mr. Fillmore does not deny using the cell phone but instead denies that the phone belonged to him.  He contends that the phone was too bulky to be his iPhone 5 model (Dkt. No. 31, ¶ 38).  He alleges that a Clinton Library volunteer shared pictures with him and that the cell phone in his hand was not his but belonged to the volunteer (*Id*.).  Mr. Fillmore maintains that a policy prohibiting possession of personal cell phones or other electronic communication devices was not a part of the post orders he had when he was terminated (Dkt. No. 32, ¶ 4).  Further, he alleges that Caucasian officers used cell phones while on post and were not punished by Mr. Morris.  On September 14, 2015, Mr. Fillmore was given a final warning reminder related to his two disciplinary write ups (Dkt. No. 25, ¶ 39).

On September 15, 2015, Mr. Fillmore received his third disciplinary from Mr. Morris. CASS contends that, on September 15, 2015, Mr. Fillmore removed confidential and proprietary information from the control center and disclosed that information to a third party without authorization and in violation of the employee handbook (*Id.*).  CASS submits that the control center houses government documents, that all documents there are confidential and proprietary, and that the employee handbook prohibits their dissemination (*Id*.).

Mr. Fillmore denies that he disclosed confidential documents.  He admits that he removed memos from the policies binder in the control room and that he made copies of them in the volunteer lounge (Dkt. No. 29, Ex. A, Dep. David Fillmore, at 83, 86-87, 94).  He admits that, on September 15, 2015, he met with Denise Persons, a NARA spokesperson, at the loading dock (Dkt. No. 32, ¶ 23).  Mr. Fillmore admits that he gave Ms. Persons his disciplinary write-up but denies showing or providing her with copies of the memos (*Id*., ¶ 25).  Mr. Fillmore contends that he discussed with Ms. Persons the purported harassment and discrimination he was experiencing at

the Clinton Library (Dkt. No. 29, Ex. A, Dep. Fillmore, at 89). Mr. Fillmore maintains that he kept the memo copies for his own records (*Id*., at 86-87).

The parties agree that copies of employee disciplinary reports are not confidential (Dkt. No. 32, ¶ 158; Dkt. No. 23, Ex. B, Dep. Vera Culpepper, at 58). CASS contends that Mr. Fillmore's removal of documents from the control center led to his third and final write up and his termination (Dkt. No. 25, ¶ 40).

On September 17, 2015, Ms. Culpepper called Mr. Fillmore and terminated him (Dkt. No. 32, ¶ 35). CASS contends that Ms. Culpepper made the decision to terminate Mr. Fillmore based upon his violation of CASS's policies and post orders, not based on his race (Dkt. No. 25, ¶ 41). CASS contends that the decision to discipline Mr. Fillmore on each occasion was made by either Mr. Similton or Ms. Culpepper after a thorough review of the facts and circumstances of each incident (*Id.*). Mr. Fillmore disputes this and maintains that Mr. Morris wrote the disciplinary reports (Dkt. No. 31, ¶ 41).

Mr. Fillmore submits that, from October 17, 2014, through May 18, 2015, he faxed multiple handwritten grievances from the volunteer lounge at the Clinton Library to CASS executives, alleging disparate treatment based on discrimination (Dkt. No. 1, ¶ 9; Dkt. No. 29, Ex. A, Dep. Fillmore, at 108). In addition, Mr. Fillmore contends that other officers communicated to Christopher Culpepper that Mr. Morris was using a different disciplinary approach with Caucasian officers than he was with African-American officers (Dkt. No. 32, ¶ 118). Mr. Fillmore asserts that, in response to the complaints, Ms. Culpepper issued a memo entitled "Constant Grumbling; Gripes and Pettiness," instructing the security officers to stop complaining (Dkt. No. 29, Ex. A, Dep. Fillmore, at 154).

On June 25, 2015, Mr. Fillmore filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") claiming that he was harassed in the form of excessive monitoring and denied use of vacation time because of his race (Dkt. No. 1, Ex. A, EEOC Charge). He contends that CASS representatives did not meet with him after he filed the first EEOC charge (Dkt. No. 32, ¶ 135). He further alleges that he was subjected to increased scrutiny after he filed his grievances (Dkt. No. 1, ¶ 10). He contends that he continued to be written up and was excessively scrutinized by Mr. Morris (*Id.*). Mr. Fillmore further submits that several officers told him he was being watched (Dkt. No. 32, ¶ 45).

On September 21, 2015, Mr. Fillmore amended his EEOC charge to include retaliation, claiming that he was written up on September 11, 2015, and discharged on September 17, 2015, because of his race and in retaliation for filing an EEOC charge (Dkt. No. 25, ¶ 43). On February 29, 2016, the EEOC dismissed Mr. Fillmore's charge and issued a Right to Sue letter (*Id.*, ¶ 44). Mr. Fillmore timely filed this lawsuit.

## II.    Standard Of Review

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989). However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir.

1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"There is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial."  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (citing *Fercello v. Cnty. of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010) (quoting *Berg v. Norand Corp.*, 169 F.3d 1140, 1144 (8th Cir. 1999)) (citing *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1118 (8th Cir. 2006))).  Accordingly, this Court applies the same summary judgment standard to discrimination cases as it does to all others.

### III.    Mr. Fillmore's Fourteenth Amendment Claim

Mr. Fillmore brings a claim of race discrimination in violation of the Fourteenth Amendment to the United States Constitution. The Fourteenth Amendment prohibits intentional discrimination or disparate treatment on the basis of race or gender by states unless they satisfy a difficult burden.  *See Washington v. Davis*, 426 U.S. 229 (1976) (race); *United States v. Morrison*, 529 U.S. 598 (2000) (gender).  The elements of a claim of intentional discrimination are essentially the same under Title VII and the Constitution.  *Okruhlik v. Univ. of Ark.*, 255 F.3d 615, 626 (8th Cir. 2001) (citing *Briggs v. Anderson*, 796 F.2d 1009, 1021 (8th Cir. 1986)).  However, because CASS is undisputedly a private, non-governmental employer, Mr. Fillmore may not maintain a discrimination claim against CASS under the Fourteenth Amendment.  *See Rodgers v. Maco*

*Mgmt. Co.*, 218 Fed. Appx. 557, 558-59 (8th Cir. 2007); *see also Jackson v. Metro. Edison Co.*, 419 U.S. 345, 349-50 (1974) (private action not subject to the Fourteenth Amendment's due process protections).  The Court grants summary judgment to CASS as to Mr. Fillmore's claim of discrimination under the Fourteenth Amendment.

### IV.    Analysis Applicable To Discrimination Claims Generally

Mr. Fillmore brings claims of race discrimination in violation of § 1981 and Title VII. "While § 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical."  *Von Zuckerstein v. Argonne Nat'l Laboratory*, 984 F.2d 1467, 1472 (7th Cir. 1993) (overruled on other grounds) (citing *Bailey v. Northern Indiana Public Service Co.*, 910 F.2d 406, 410 (7th Cir. 1990) (superseded by statute)); *see also Kim v. Nash Finch Co.*, 123 F.3d 1046, 1056 (8th Cir. 1997).  Employment discrimination claims under § 1981 and Title VII are analyzed under the same three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Kim*, 123 F.3d at 1056.

Mr. Fillmore can establish a *prima facie* case of discrimination either by providing direct evidence of discrimination or by creating an inference of unlawful discrimination under the three-step analysis set out in *McDonnell Douglas*.  *Bone v. G4S Youth Services, LLC*, 686 F.3d 948, 953 (8th Cir. 2012).  Direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action. *Torgerson,* 643 F.3d at 1044 (quoting *Thomas v. First Nat'l Bank of Wynne,* 111 F.3d 64, 66 (8th Cir. 1997)).  Therefore, "direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence.  *Id.*  A plaintiff with strong direct evidence that illegal discrimination

10

motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury, irrespective of whether his strong evidence is circumstantial. *Id.* However, "if the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext." *Id.*

### A.    Direct Evidence Analysis

"To be entitled to direct evidence analysis, the plaintiff must present evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the fact finder to infer that that attitude was more likely than not a motivating factor in the employer's decision." *Rivers-Frison v. Se. Mo. Cmty. Treatment Ctr.*, 133 F.3d 616, 619 (8th Cir. 1998) (internal quotation marks omitted). Mr. Fillmore has presented no direct evidence of discrimination in support of any of his claims. Accordingly, the Court will proceed through the *McDonnell Douglas* analysis.

### B.    *McDonnell Douglas* Analysis

Under the *McDonnell Douglas* analysis, "the plaintiff bears the burden of establishing a *prima facie* case of discrimination." *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 873 (8th Cir. 2007). If a plaintiff makes out a *prima facie* case, he creates a presumption of unlawful discrimination, and the burden shifts to the defendant to come forward with evidence of a legitimate nondiscriminatory reason for its actions. *Id.* If the defendant articulates such a reason, the burden returns to the plaintiff to show the defendant's proffered reason is pretextual and that unlawful discrimination was the true reason for the adverse employment action. *Tyler v. Univ. of Ark. Bd. of Trustees*, 628 F.3d 980, 990 (8th Cir. 2011). Pretext may be demonstrated by different means. *See, e.g., Roxas v. Presentation College*, 90 F.3d 310, 316 (8th Cir. 1996).

V.    **Cat's Paw Theory Of Liability**

As an initial matter, Mr. Fillmore submits that he is proceeding on his race discrimination claims under a "cat's paw" theory of liability.  Mr. Fillmore presents no evidence that Louis Culpepper, Vera Culpepper, Christopher Culpepper, or Mr. Similton were motivated to discriminate against him on the basis of race.  Instead, Mr. Fillmore contends that Mr. Morris was the actual decision maker at CASS, that Mr. Morris acted with discriminatory intent, and that the Culpeppers acquiesced to Mr. Morris' disciplinary decisions (Dkt. No. 30, at 15).

"In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Qamhiyah v. Iowa State Univ. of Sci. & Tech*., 566 F.3d 733, 742 (8th Cir. 2009) (quoting *EEOC v. BCI Coca-Cola Bottling Co. of L.A.,* 450 F.3d 476, 484 (10th Cir. 2006)).  Under the theory, an employer cannot shield itself from liability for unlawful termination by using a purportedly independent person or committee as the decision maker where the decision maker merely serves as the "conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design." *Richardson v. Sugg*, 448 F.3d 1046, 1060 (8th Cir. 2006) (quotation omitted).  Thus, an employer may be vicariously liable for an adverse employment action if one of its agents—other than the ultimate decision maker—is motivated by discriminatory animus and intentionally and proximately causes the action.  *Bennett v. Riceland Foods, Inc*., 721 F.3d 546, 551 (8th Cir. 2013) (citing *Staub v. Proctor Hosp*., 131 S. Ct. 1186, 1190-91, 1194 (2011)).

It is unclear if the cat's paw theory of liability may be used for claims pursued through the *McDonnell Douglas* burden-shifting framework as is the case here.  *See Diaz v. Tyson Fresh Meats, Inc*., 643 F.3d 1149, 1152 (8th Cir. 2011) ("Our cat's paw cases involve what the Court

calls direct-evidence claims . . . not claims pursued through the McDonnell Douglas burden-shifting framework."). Even if the Court were to entertain Mr. Fillmore's cat's paw theory, his race discrimination claim fails for other reasons.

Mr. Fillmore argues that it was Mr. Morris who signed each disciplinary write up and that the Culpeppers simply acquiesced to everything Mr. Morris did (Dkt. No. 30, at 16). Mr. Fillmore admits, however, that Mr. Morris, as site manager, was primarily responsible for administering disciplinary procedures to the security officers (*Id.*, at 15). Mr. Fillmore argues that Mr. Morris' word was taken as exactly what happened and that the write ups Mr. Morris gave were not questioned (*Id.*, at 16). Mr. Fillmore argues that, prior to Mr. Morris' appointment as on-site supervisor, Mr. Fillmore had not received a write up. He further contends that, when officers complained to the Culpeppers about Mr. Morris' treatment of officers, the Culpeppers blamed the officers for not getting along or adjusting to Mr. Morris' leadership style (*Id.*).

However, based on the record evidence before the Court, Ms. Culpepper called Mr. Fillmore and terminated him based on his progressive discipline and for disclosing confidential documents. In her affidavit, Ms. Culpepper states in regard to the instances of progressive discipline that "the decision to discipline Mr. Fillmore on each of these occasions was made by either Larry Similton or myself. The decisions to discipline Mr. Fillmore were made after a thorough review of the facts and circumstances in each incident. I based my decisions to discipline and terminate Mr. Fillmore on his violation of CASS's policies and post orders" (Dkt. No. 23, Ex. A., Aff. Vera Culpepper, ¶ 49). In addition, there is record evidence that Mr. Morris was in communication with Mr. Similton and Ms. Culpepper regarding Mr. Fillmore's cell phone violation and alleged distribution of documents before any progressive discipline was given to Mr. Fillmore as a result of these alleged incidents (Dkt. No. 23-9). When considering a cat's paw

theory of liability, while "an independent review by the ultimate decisionmaker does not necessarily resolve the causation issue in the employer's favor[,]" it can be considered in determining whether that decisionmaker's decision was "untainted" when considering a cat's paw theory of liability. *Nettles v. Hytrol Conveyor Co.*, Case No. 3:15-cv-00123-KGB, 2016 U.S. Dist. LEXIS 122129, *19-20 (E.D. Ark. Sept. 9, 2016).

Here, in response to Ms. Culpepper's affidavit, Mr. Fillmore has presented no record evidence that Mr. Morris was in fact the true decision maker or that the Culpeppers merely acquiesced to Mr. Morris's disciplinary decisions. *See Dedmon v. Staley,* 315 F.3d 948, 949-50 (8th Cir. 2003) (affirming the district court's refusal to provide a cat's paw instruction because the plaintiff had failed to adduce sufficient evidence that the immediate supervisor "initiated, exercised, or even possessed any influence or leverage over" the ultimate decision maker). Absent such record evidence, any claim that Mr. Morris used CASS as a "cat's paw" to advance any animus or racial bias he might have held fails. Further, taken as a whole, the record evidence does not support this theory. From August 1, 2014, to September 15, 2015, the relevant period, African American and Caucasian employees were disciplined and terminated for a variety of offenses (Dkt. No. 32, ¶¶ 141, 143-150 (citing Vera Culpepper's deposition testimony)). Based on the record evidence before the Court, drawing all reasonable inferences in favor of Mr. Fillmore, no reasonable juror could find in favor of Mr. Fillmore on this theory. Mr. Fillmore cannot use the cat's paw theory of liability to satisfy his burden that CASS's alleged decision to fire him for violating the progressive discipline policy was pretext for race discrimination.

### VI.    Race Discrimination Claim

Mr. Fillmore alleges, in the alternative, that the Court should examine his race discrimination claim against CASS by applying the *McDonnell Douglas* analysis. To establish a

*prima facie* case of race discrimination based on his complaints of different treatment and termination, Mr. Fillmore must show that: "(1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination (for example, similarly situated employees outside the protected class were treated differently)." *Young v. Builders Steel Co.*, 754 F.3d 573, 577 (8th Cir. 2014) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853-54 (8th Cir. 2012)). If an employee carries his burden of establishing a *prima facie* case of discrimination, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.*, at 577-78. "If the employer meets this burden of production, the employee must then 'prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination.'" *Rooney v. Rock-Tenn Converting Co.*, 878 F.3d 1111, 1115-1116 (8th Cir. 2018) (quoting *Grant v. City of Blytheville, Ark.*, 841 F.3d 767, 773 (8th Cir. 2016)).

### A.    *Prima Facie* Case

It is undisputed that Mr. Fillmore can satisfy the first and third prongs of his *prima facie* case. However, CASS disputes that Mr. Fillmore was meeting CASS's legitimate job expectations when he was: (1) disciplined for leaving his post without relief in October 2014; (2) observed on two occasions in September 2015 using his cell phone while on post; and (3) observed taking confidential documents from the control room and passing the documents to a third party in violation of policy (Dkt. No. 24, at 13). CASS contends that Mr. Fillmore's repeated violations of post orders and policies demonstrate that Mr. Fillmore was not meeting the legitimate employment expectations of CASS. Mr. Fillmore argues that he was meeting CASS's employment expectations because he was employed by CASS from 2009 to October 2014 without complaints by CASS

(Dkt. No. 30, at 6). Mr. Fillmore submits that he had complied with the training requirement hours and passed his interview to be rehired at the Clinton Library when CASS took over the security contract in 2009 (*Id.*). He contends that there are no other complaints against him and that the violations themselves were motivated by discrimination (*Id.*).

"The standard for assessing performance 'is not that of the ideal employee, but rather what the employer could legitimately expect.'" *Calder v. TCI Cablevision of Mo., Inc.*, 298 F.3d 723, 729 (8th Cir. 2012) (quoting *Keathley v. Ameritech Corp.*, 187 F.3d 915, 920 (8th Cir. 1999)). Mr. Fillmore must do more than insist that he was a good employee or that others thought he was a good employee. *See Cherry v. Ritenour Sch. Dist.*, 253 F.Supp.2d 1085, 1095 (E.D. Mo. 2003) (collecting cases). He "must show by independent evidence in the summary judgment record that he 'was actually performing' his job at the level specified by Defendant." *Cherry*, 253 F.Supp.2d at 1095 (quoting *Whitley v. Peer Review Sys., Inc.*, 221 F.3d 1053, 1055 (8th Cir. 2000)).

The "[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions." *Torlowei v. Target*, 401 F.3d 933, 935 (8th Cir. 2005) (quoting *Wilking v. County of Ramsey*, 153 F.3d 869, 873 (8th Cir. 1998)). The undisputed record evidence demonstrates that Mr. Fillmore engaged in conduct resulting in progressive discipline. CASS maintains it instituted a change in discipline and enforcement of policies when its contract was renewed in 2014; Mr. Fillmore presents no record evidence to dispute this. Further, Mr. Fillmore does not dispute that he did not obtain relief to use the bathroom while working his roving post position. Nor does he dispute that he used a cell phone while on post, although he claims it was not his cell phone. Mr. Fillmore does not dispute receiving a final warning letter after being issued his second disciplinary write up by Mr. Morris. Further, Mr. Fillmore does not dispute taking confidential documents from the control room and making copies or meeting with Ms. Persons

16

and handing her documents related to his discrimination complaints. Based on the record evidence, construing all reasonable inferences in favor of Mr. Fillmore, the Court determines that no reasonable juror could conclude that Mr. Fillmore was meeting his employer's legitimate job expectations, and thus, he fails to satisfy the third element of his *prima facie* case. As a result, Mr. Fillmore is unable to establish a *prima facie* case for race discrimination.

Even if Mr. Fillmore could establish the third element of his *prima facie* case, he still must show circumstances which would give rise to an inference of discrimination. To satisfy this requirement, Mr. Fillmore attempts to present evidence to the Court that similarly situated employees outside the protected class were treated differently. Mr. Fillmore must set forth evidence sufficient to show that he and his proposed comparators were "involved in or accused of the same or similar conduct and [were] disciplined in different ways." *Jones v. City of St. Louis*, 825 F.3d 476, 481 (8th Cir. 2016) (citing *Chappell v. Bilco Co*., 675 F.3d 1110, 1118 (8th Cir. 2012)). Mr. Fillmore alleges that similarly situated Caucasian employees were not disciplined as harshly or not at all for engaging in the same or similar conduct for which he was terminated. The Eighth Circuit has set a "'low threshold' for employees to be considered similarly situated" at the *prima facie* stage, "requiring only that the employees 'are involved in or accused of the same or similar conduct and are disciplined in different ways.'" *Orr v. City of Rogers*, 232 F. Supp. 3d 1052, 1063 (W.D. Ark. 2017) (quoting *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 851 (8th Cir. 2005) (abrogated in part)).

### B.     Legitimate, Nondiscriminatory Reason For Termination

Even if Mr. Fillmore establishes a *prima facie* case, the burden shifts to CASS to articulate a legitimate, non-discriminatory reason for firing Mr. Fillmore. *See Twymon v. Wells Fargo & Co*., 462 F.3d 925, 934 (8th Cir. 2006) (shifting the burden to defendant to provide a legitimate,

non-discriminatory reason for plaintiff's termination where plaintiff makes out a *prima facie* case of discrimination).  CASS has done this.  CASS cites to Mr. Fillmore's record of progressive discipline as the reason for his termination and for disclosing confidential and proprietary documents to an unauthorized third party in violation of the employee handbook.  CASS alleges that, following the inception of the 2014 contract, Mr. Fillmore was disciplined three times:  (1) on October 18, 2014, for abandoning his post without relief in violation of the post orders; (2) on September 11, 2015, for using his cell phone on post in violation of the employee handbook and post orders; and (3) on September 15, 2015, for removing confidential and proprietary information from the control center and disclosing that information to a third party without authorization (Dkt. No. 24, at 6).  CASS submits that Mr. Fillmore was ultimately terminated based on his disciplinary record of three write ups.  The Eighth Circuit Court of Appeals has repeatedly held that violation of company policy is a legitimate reason for termination.  *See Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999); *Price v. S-B Power Tool*, 75 F.3d 362, 365 (8th Cir. 1996); *Lidge-Myrtil v. Deere & Co.*, 49 F.3d 1308, 1310-11 (8th Cir. 1995).

### C.    Pretext

CASS maintains that, even if Mr. Fillmore can establish a *prima facie* case, he cannot demonstrate that CASS's proffered reason for terminating him was a pretext for race discrimination.  This Court agrees.  Because CASS provided a legitimate, non-discriminatory reason for the termination, the burden returns to Mr. Fillmore to present evidence that the reasons offered by CASS are a pretext for discrimination.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  To prove pretext, Mr. Fillmore must both discredit the employer's asserted reason for termination and show that the circumstances permit drawing the reasonable inference

that the real reason for terminating him was his race. *Johnson v. AT&T Corp.*, 422 F.3d 756, 763 (8th Cir. 2005).

### 1.      Investigation And Good Faith Belief

To the extent Mr. Fillmore attempts to establish pretext by arguing CASS's reason for his termination is unworthy of credence, the Court rejects that argument.   The proffered non-discriminatory reason for termination need not be factually correct so long as the employer honestly believed the asserted grounds at the time of the termination.  *See Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995).   If an employer honestly believes that an employee is terminated for misconduct, but it turns out later that the employer was mistaken about whether the employee violated a workplace rule, the employer cannot be held liable for discrimination.  *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 637 (8th Cir. 2000).  The question of whether CASS's belief was honest at the time it terminated Mr. Fillmore is dependent to an extent on whether its investigation was conducted in good faith.

The general rule is that "[t]he appropriate scope of investigation is a business judgment, and shortcomings in an investigation do not by themselves support an inference of discrimination." *McCullough v. Univ. of Ark. for Med. Sciences*, 559 F.3d 855, 863 (8th Cir. 2009) (citing *Wheeler v. Aventis Pharm.*, 360 F.3d 853, 859 (8th Cir. 2004)).   However, certain shortcomings in the investigation may suggest that it was so limited as to not have been conducted in good faith.  Mr. Fillmore criticizes CASS's investigation of the facts leading to his termination, but those criticisms in the light of the record evidence as a whole do not suffice to prove pretext.

In *Wierman v. Casey's General Stores*, the Eighth Circuit Court of Appeals held that an employer does not have to provide an employee the opportunity to respond to allegations when those allegations have been corroborated by independent evidence.  638 F.3d 984, 996-97 (8th Cir.

2011). Here, according to the record evidence, CASS made its decision to terminate based on the written statements of two witnesses to the events – the witnesses were not Mr. Morris (Dkt. No. 23, Ex. 11, Witness Stmts.). That an employer is selective in its investigation does not permit an inference of discrimination without evidence that "investigators purposely ignored relevant information or otherwise truncated the inquiry because of bias. . . ." *McCullough*, 559 F.3d at 863. CASS did not speak to Ms. Persons about these events, but there is no indication that CASS's failure to do so was motivated by racial bias. On this record evidence, no reasonable juror could conclude that CASS's proffered reason was pretext.

### 2.    Potential Comparators

Mr. Fillmore also attempts to establish pretext and a reasonable inference of discrimination by comparing his situation to potential comparators. The standard in the Eighth Circuit Court of Appeals to determine whether employees are similarly situated at the pretext stage "is a search for a substantially similar employee, not for a clone." *Burton v. Arkansas Sec'y of State*, 737 F.3d 1219, 1231 (8th Cir. 2013) (quotations omitted). "To demonstrate that they are 'similarly situated,' he need only establish that he [ ] was treated differently than other employees whose violations were of *comparable seriousness*." *Id.* (emphasis in original) (quotations omitted).

Even so, "[a]t the pretext stage, 'the test for determining whether employees are similarly situated to a plaintiff is a rigorous one.'" *Bone*, 686 F.3d at 956 (quoting *Rodgers*, 417 F.3d at 853). To succeed at this stage of the proceedings, Mr. Fillmore must show that he and the potential comparators he identifies were "similarly situated in all relevant respects." *Id.* Thus, "[w]hat is relevant is [whether they] are involved in or accused of the same offense and are disciplined in different ways." *Boner v. Bd. of Comm'rs*, 674 F.2d 693, 697 (8th Cir. 1982). The employees used for comparison "must have dealt with the same supervisor, have been subject to the same

standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Wierman,* 638 F.3d at 994 (quoting *Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 479 (8th Cir. 2004)); *see also Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994) (noting that employees are similarly situated when they are "similarly situated in all relevant respects" and "are involved in or accused of the same offense and are disciplined in different ways."); *Forrest v. Kraft Foods, Inc.,* 285 F.3d 688, 691-92 (8th Cir. 2002) (evidence of disparate treatment can support assertion of pretext, but comparable employee must have been similarly situated to plaintiff in all relevant respects; comparator was not similarly situated where plaintiff did not show "comparable disciplinary history").

Mr. Fillmore does not list specific individuals as comparators. Instead, the record is replete with references to alleged events and circumstances involving individuals with whom Mr. Fillmore worked. Based on a thorough analysis of the record, the Court concludes no reasonable juror could find in favor of Mr. Fillmore on the question of pretext based on alleged comparator evidence. For purposes of this Order, the Court identifies for specific discussion four individuals in the record evidence who may serve as potential comparators: Mr. Abel, Sergeant Galow, Christopher Shroyer, and Officer Stikes. For the following reasons, the Court concludes that none is a proper comparator.

The Court finds that Mr. Abel is not a proper comparator. Mr. Abel is Caucasian. Mr. Fillmore alleges that that, on November 7, 2014, he witnessed Mr. Abel leave his post without obtaining relief from 7:00 a.m. to 7:30 a.m. (Dkt. No. 30, at 8). Mr. Fillmore does not contend that CASS was aware of Mr. Abel's alleged absence without relief on November 7, 2014. Further, the record evidence does not make clear whether Mr. Abel was disciplined for his alleged absence. Based on the record evidence and construing all reasonable inferences in favor of Mr. Fillmore,

the Court determines that no reasonable juror could conclude that Mr. Abel's conduct involved the same conduct of that as Mr. Fillmore with no mitigating or distinguishing circumstance. As such, he fails as a comparator.

The Court finds that Sergeant Galow is not a proper comparator. Sergeant Galow is Caucasian. Mr. Fillmore submits that, while serving as a relief officer for Officer Rathke, Officer Galow left the post he was supposed to be relieving (Dkt. No. 30, at 8). It is unclear from the record evidence if CASS was aware of Sergeant Galow's alleged absence from his post. It is unclear from the record evidence if Sergeant Galow was disciplined for his alleged absence. Mr. Fillmore also alleges that Sergeant Galow gave his friends and family an after-hours tour of the Clinton Library. This is not the same conduct for which Mr. Fillmore was disciplined. Further, it is unclear from the record if Sergeant Galow, as a sergeant, was in the same position and subject to the same standards as Mr. Fillmore as security officer. As such, the Court determines that no reasonable juror could conclude that Sergeant Galow was similarly situated in all relevant aspects to Mr. Fillmore. Sergeant Galow fails as a comparator.

The Court finds that Mr. Shroyer is not a valid comparator. Mr. Shroyer is Caucasian. Mr. Fillmore contends that Mr. Shroyer used the restroom without relief during his rover shift and was not disciplined (Dkt. No. 30, at 12). There is no evidence in the record that Mr. Morris or CASS were aware of Mr. Shroyer's alleged failure to obtain relief during his rover shift; as such, a lack of discipline for that alleged infraction is insufficient to support an allegation of race discrimination.

Mr. Fillmore next submits that Mr. Shroyer used his cell phone at post and was not disciplined. Mr. Fillmore submits the deposition testimony of security officer Jerome Washington, who stated that Mr. Shroyer worked the main entrance post at the Clinton Library, would be so

engrossed in his cell phone that he would turn his back to the camera to be on the phone, but was never disciplined for this alleged conduct (Dkt. No. 30, at 10). There is evidence in the record indicating that Mr. Morris was aware of Mr. Shroyer's cell phone use. Mr. Fillmore submits the deposition testimony of security officer Quintezz Hayes, who testified that, after observing Mr. Shroyer using his cell phone from the security cameras, Mr. Morris sent a sergeant to Mr. Shroyer's post to tell him to get off the phone (Dkt. No. 29, Ex. 4, Dep. Quintezz Hayes, at 11-12). It is unclear when this alleged event occurred. The Court acknowledges that there is no record evidence of Mr. Shroyer being disciplined for cell phone use.

Even if this Court could conclude on the record evidence that Mr. Shroyer is a comparator as to leaving his post and using his cell phone, a conclusion difficult to reach on this record, there is no indication that Mr. Shroyer engaged in a third infraction comparable to Mr. Fillmore – the events for which Mr. Fillmore was terminated. Further, there is evidence in the record that Mr. Shroyer, who is Caucasian, received a disciplinary write up on November 17, 2014, for insubordination and a second disciplinary write up on November 24, 2014, for no call/no show (Dkt. No. 29, Ex. 7, Dep. V. Culpepper, at 47-48). For these reasons, the Court determines that no reasonable juror could conclude that Mr. Shroyer's conduct involved the same conduct with no mitigating or distinguishing circumstances as that of as Mr. Fillmore. Mr. Shroyer fails as a comparator.

The Court finds that Officer Stikes is not a valid comparator. Mr. Fillmore contends that "white guys were witnessed talking on the phone, and it included Officer Stikes" (Dkt. No. 30, at 9). He offers no further detail regarding Officer Stikes' alleged infractions. As such, the Court determines that no reasonable juror could conclude that Officer Stikes' conduct involved the same

conduct of that as Mr. Fillmore with no mitigating or distinguishing circumstance. Officer Stikes fails as a comparator.

The Court notes that throughout his pleadings, Mr. Fillmore alleges that Caucasian officers were treated differently than African-American officers for various infractions such as tardiness, no call/no show, and failure to "arm up" as required by CASS policy (Dkt. No. 30, at 9-10, 12-13). Mr. Fillmore attempt to equate tardiness with not obtaining proper relief while on post (*Id*). While that may be sufficient comparable conduct at the *prima facie* stage, it is insufficient for establishing pretext. Tardiness, no call/no show, and failure to "arm up" are not the same conduct for which Mr. Fillmore was disciplined and ultimately terminated; as such, those individuals are not valid comparators. Further, the record before the Court lacks sufficient information to determine whether those violations were of "comparable serious" to the conduct of Mr. Fillmore such that the officers were similar in all relevant aspects. *Rodgers*, 417 F.3d at 853-54. In addition, Mr. Fillmore points to Mr. Morris as not being subject to discipline when he was late, complains that Mr. Morris did not obtain relief when absent from his post, and alleges that Mr. Morris used his cell phone to talk to his family and friends while on duty. Mr. Morris served as supervisor to the security officers, and there is no record evidence to establish that Mr. Morris was subject to the same conduct standards as security officers. Mr. Fillmore provides scant detail as to the circumstances surrounding Mr. Morris' alleged infractions. As such, Mr. Morris is not a valid comparator.

Mr. Fillmore also points to record evidence suggesting that other CASS employees claimed Mr. Morris treated employees differently based on race. Having rejected the "cat's paw" theory of liability, this record evidence even if believed is not probative regarding the alleged motivation of the ultimate decision maker – here Ms. Vera Culpepper.

24

Moreover, the record evidence includes reference to one other employee who received progressive discipline for three events from August 1, 2014, to September 15, 2015, resulting in his termination – that employee was Caucasian (Dkt. No. 23, Ex. B, Dep. V. Culpepper, at 48, 51). The employee received discipline for failure to follow policies as a result of a 911 call, for no call/no show, and for violating the cell phone policy. The Court concludes that no reasonable juror could find in favor of Mr. Fillmore on the question of pretext based on alleged comparator evidence.

CASS is entitled to judgment as a matter of law in its favor on Mr. Fillmore's claims of race discrimination. Mr. Fillmore has not shown that similarly situated employees outside of the protected class were treated differently. Accordingly, the Court grants CASS's motion for summary judgment, enters judgment in its favor, and dismisses with prejudice Mr. Fillmore's race discrimination claims.

**VII.    Retaliation Claim**

Title VII and §1981 also make it an unlawful employment practice for an employer to discriminate against its employees for opposing any unlawful employment practice. 42 U.S.C. § 2000e–3(a); *see also Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 977 (8th Cir. 2012) (Title VII); *Evans v. Kansas City, Missouri, School District*, 65 F.3d 98, 101 (8th Cir. 1995) (§ 1981), *cert. denied*, 517 U.S. 1104 (1996). Mr. Fillmore alleges retaliation (Dkt. No. 1, ¶ 13).

Mr. Fillmore offers no direct evidence of retaliation. Therefore, the Court evaluates his retaliation claim under the *McDonnell Douglas* burden-shifting framework. *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 880 (8th Cir. 2014) (Title VII); *Evans*, 65 F.3d at 101 (§ 1981). To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) he engaged in statutorily protected conduct; (2) he suffered an adverse employment action; and (3) a causal connection exists between

the two. *Fiero*, 759 F.3d at 880 (quoting *Wells v. SCI Mgmt., L.P.*, 469 F.3d 697, 702 (8th Cir. 2006)); *Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 259 (8th Cir. 1996). Unlike discrimination claims, for an adverse retaliatory action to be "because" a plaintiff opposed an employment action, the plaintiff must plausibly allege that the retaliation was a "but-for" cause of the employer's adverse action. *Blomker v. Jewell*, 831 F.3d 1051, 1059 (8th Cir. 2016) (Title VII); *Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 737-38 (8th Cir. 2013) (Title VII and § 1981). It is not enough that retaliation was a "substantial" or "motivating" factor in the employer's decision. *Id.* If the plaintiff makes this *prima facie* showing, the employer "must then rebut it 'by presenting evidence of a legitimate, non-retaliatory reason for the action it took against [the plaintiff].'" *Fiero*, 759 F.3d at 880 (quoting *E.E.O.C. v. Kohler*, 335 F.3d 766, 772–73 (8th Cir. 2003)). "If [the employer] satisfies this burden, [the plaintiff] is 'then obliged to present evidence that (1) creates a question of fact as to whether [the employer's] proffered reason was pretextual and (2) creates a reasonable inference that [the employer] acted in retaliation.'" *Id.* (quoting *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002)).

Mr. Fillmore received his first disciplinary write up in October 2014. Mr. Fillmore submits that from October 17, 2014, to May 8, 2015, he sent handwritten grievances to CASS complaining of Mr. Morris' alleged discriminatory conduct (Dkt. No. 1, ¶ 9). Mr. Fillmore submits that he met with Christopher Culpepper in April 2015 and made Mr. Culpepper aware of his belief that Mr. Morris was discriminating against Mr. Fillmore based on his race. Mr. Fillmore filed his EEOC charge on June 25, 2015, and amended it on September 19, 2015 (Dkt. No. 1, Ex. A, EEOC Charge). Mr. Fillmore alleges that, after he filed the charge, Mr. Morris began to surveil Mr. Fillmore and overly scrutinize his actions. Mr. Fillmore subsequently received two write ups in September 2015 and was ultimately fired on September 17, 2015. Mr. Fillmore alleges that, when

he complained to CASS executives of discriminatory conduct by Mr. Morris, Ms. Culpepper issued a memo to the security officers entitled "Constant Grumbling; Gripes and Pettiness" instead of responding to Mr. Fillmore's allegations of discrimination.

CASS contends that there is no nexus between Mr. Fillmore's claim of retaliation and his termination.  CASS contends that Mr. Fillmore was first disciplined in October 2014, before the filing of his EEOC charge, and that his final disciplinary occurred in September 2015, some four months after he submitted his EEOC charge (Dkt. No. 24, at 21).  CASS submits that there is no evidence of a causal connection between Mr. Fillmore's EEOC charge and his termination and that he cannot show that his protected activity was the "but for" cause of his termination (*Id*.).  The Court finds that, on the record evidence drawing all reasonable inferences in his favor, Mr. Fillmore has failed to carry his burden of demonstrating that his statutorily protected activity was the "but for" cause of his termination.

The Eighth Circuit Court of Appeals has held that "an inference of a causal connection between [protected conduct] and [an adverse employment action] can be drawn from the timing of the two events, but in general more than a temporal connection is required to present a genuine factual issue on retaliation." *Thomas v. Corwin*, 483 F. 3d 516, 531 (8th Cir. 2007).  A large gap of time between the alleged adverse actions and the protected activity dilutes an inference of causation.  *Muor v. U.S. Bank Nat'l Assoc.*, 716 F. 3d 1072, 1079 (8th Cir. 2013).  Therefore, "as more time passes between the protected conduct and the retaliatory act, the inference of retaliation becomes weaker and requires stronger alternative evidence of causation." *Id.* (quoting *Tyler*, 628 F. 3d at 986 (holding that the inference of retaliatory motive vanishes when the time span between the protected activity and the adverse employment action is measured in months)).

A pattern of adverse actions that occur just after protected activity can supply the extra quantum of evidence to satisfy the causation requirement. *See Bassett v. City of Minneapolis,* 211 F.3d 1097, 1105–06 (8th Cir. 2000) (abrogated in part on other grounds) (extensive pattern of protected activity followed by disciplinary measures established causation); *Hudson v. Norris,* 227 F.3d 1047, 1051 (8th Cir. 2000) (large number of adverse actions within four months of protected activity, plus evidence of pretext, established causation).    Even without a pattern, the Eighth Circuit Court of Appeals has sometimes held that the timing of one incident of adverse employment action following protected activity suffices to establish a causal connection. *See*, *e.g., Sprenger v. Federal Home Loan Bank,* 253 F.3d 1106, 1113–14 (8th Cir. 2001) (temporal proximity sufficient to establish *prima facie* case of disability discrimination but not to show pretext*); O'Bryan v. KTIV Television,* 64 F.3d 1188, 1193–94 (8th Cir. 1995) (three months between filing administrative complaints and firing established causal connection), *but see Gagnon v. Sprint Corp.,* 284 F.3d 839, 851, 852 (8th Cir. 2002) (one month's time between response to EEOC claim and adverse action did not establish causation); *Kipp v. Missouri Highway and Transp. Comm'n,* 280 F.3d 893, 897 (8th Cir. 2002) ("[A] 'mere coincidence of timing' can rarely be sufficient to establish a submissible case of retaliatory discharge."); *Scroggins v. Univ. of Minn.,* 221 F.3d 1042, 1045 (8th Cir. 2000) (same); *Bradley v. Widnall,* 232 F.3d 626, 633 (8th Cir. 2000) (abrogated in part on other grounds) (determining plaintiff "must do more than point to the temporal connection between the filing of her first complaint and the Air Force's allegedly adverse actions.").

Mr. Fillmore's protected activity occurred at the earliest in April 2015 when Mr. Fillmore made Christopher Culpepper aware of his belief that Mr. Morris was discriminating against him on the basis of race and occurred again on June 25, 2015, when Mr. Fillmore filed his EEOC

charge.  Mr. Fillmore received three disciplinary write ups from CASS.  The first disciplinary write up Mr. Fillmore received predated his complaint to Christopher Culpepper and the filing of his charge.  It occurred in October 2014; it provides no support for Mr. Fillmore's retaliation claim. Mr. Fillmore's third and final write up that lead to his termination occurred in September 2015, nearly three months after he filed his EEOC charge.  Such facts, standing alone, do not support an inference of causal connection.

In further support of his retaliation claim, Mr. Fillmore points to the memorandum issued by the Culpeppers referring to "constant grumbling, gripes, and pettiness" (Dkt. No. 30, at 17). That memorandum was circulated to all security officers by Vera Culpepper, explained job expectations, reviewed a change in those expectations under the new contract between CASS and NARA, and confirmed that Mr. Morris was carrying out CASS's policies (Dkt. No. 29, Ex. 15). Even drawing all reasonable inferences in favor of Mr. Fillmore, this record evidence is insufficient to support an inference of causal connection or retaliation.

Mr. Fillmore also claims he was under increased scrutiny by Mr. Morris.  No record evidence establishes when Mr. Fillmore believes this increased scrutiny began.  Therefore, it is unclear from the record evidence whether, if increased scrutiny in fact occurred, it was tied to Mr. Fillmore's complaint to Christopher Culpepper or the filing of his EEOC charge.  Futher, Mr. Fillmore alleges that both African-American and Caucasian officers were watching him.  It is unclear whether he contends this was as a result of his complaints of discrimination, based on his race, or based on something else (Dkt. No. 23, Ex. C., Dep. Fillmore, at 123-125.  CASS maintains that, at the time the contract with NARA was renewed in 2014, security officers all were under increased scrutiny and a demand for stricter compliance with policy (Dkt. No. 29, Ex. 15).

As such, Mr. Fillmore fails to demonstrate a *prima facie* case of retaliation.  The record evidence does not support a reasonable juror finding that Mr. Fillmore's alleged complaints were the "but for" cause, or even a motivating cause, of any adverse employment action taken against him.  Even if Mr. Fillmore could establish a *prima facie* case of retaliation, he fails to demonstrate that CASS's legitimate, non-discriminatory reasons for its conduct were pretext for the reasons explained above and that a retaliatory motive was the real reason for CASS's actions.  CASS is entitled to summary judgment on Mr. Fillmore's retaliation claim.

**VIII.    Conclusion**

For these reasons, the Court grants CASS's motion for summary judgment and enters judgment in favor of CASS on Mr. Fillmore's discrimination and retaliation claims (Dkt. No. 23). Mr. Fillmore's claims are hereby dismissed with prejudice.  Judgment will be entered accordingly.

So ordered this the 30th day of March, 2018.

Kristine G. Baker
United States District Court Judge

30